## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**DAVID S. FABER,**

      **Plaintiff,**

**vs.**                                     **CASE NO. 5:05cv54-LC/WCS**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

      This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

      Plaintiff, David S. Faber, applied for a period of disability, disability insurance benefits, and supplemental security income benefits.  Plaintiff was 43 years old at the time of the administrative decision, had a 12th grade education, and had past relevant work as a worker in a feed store and a party rentals store, and as a construction worker remodeling houses and installing vinyl siding.  Plaintiff alleges disability commencing on

November 9, 2002, due to back pain and a failed spinal fusion.  The Administrative Law Judge found that Plaintiff retains the residual functional capacity to perform light work, and could not return to his past relevant work.  Relying upon the "grids,"[1] the ALJ determined that Plaintiff is was not disabled as defined by Social Security law.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber

---

[1] The Medical-Vocational Guidelines, 20 C.F.R. § 404.1569, and appendix 2 to subpart P.

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.    Does the individual have any impairments which prevent past relevant work?

5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Analysis**

> **The standard for evaluation of pain testimony**

Plaintiff first contends that the ALJ failed to properly consider Plaintiff's subjective

complaints of pain in determining Plaintiff's residual functional capacity to do light work.

He contends that the ALJ simply did an independent review of the medical record.

Pain and other symptoms reasonably attributed to a medically determinable

impairment are relevant evidence for determining residual functional capacity.  Social

Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or

non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms,
> the claimant must satisfy two parts of a three-part test showing:  (1) evidence of
> an underlying medical condition; and (2) either (a) objective medical evidence
> confirming the severity of the alleged pain; or (b) that the objectively determined
> medical condition can reasonably be expected to give rise to the claimed pain.
> *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits
> subjective testimony, he must articulate explicit and adequate reasons for doing

so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain standard if his findings "leave no doubt as to the appropriate result" under the law.  Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

"A claimant's subjective testimony supported by medical evidence that satisfies the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted).  "[W]here proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  *Id.* at 1562, *quoting*, Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983).

The administrative hearing was held on June 23, 2004.  R. 273.  Plaintiff testified that he had had surgery for herniated discs, and had two discs removed.  R. 286.  The fusion was fixed with a bone graft and metal plates.  *Id.*  He said he still has sciatic pain in his left leg, and said his "whole left side stays numb."  R. 287.  He said that once in a while his hip "goes out."  *Id.*

Plaintiff said he had been driven to the hearing by his girlfriend.  R. 288.  He said

he had not been driving a motor vehicle in the last nine months due to pain.  *Id.*  He said

that he rode a cart when he went grocery shopping with his girlfriend.  R. 289.  He said

that he had gone swimming a couple of times in the prior few years.  R. 290.  He said

he spent his days lying on a bed watching some television or sitting in a recliner.  *Id.*

and R. 293.  He had three horses and 17 chickens at his home.  R. 291.  He implied

that his girlfriend and 12 year old son fed these animals.  *Id.*  He said he did not do any

cooking, laundry, or house cleaning.  R. 292.

Plaintiff said that he walks in the yard sometimes, but this causes his back to hurt

and his leg to go numb.  R. 293.  He said he walked and then rested throughout the

day.  R. 295.  He said he could walk only about 5 minutes without severe sharp pain.

*Id.*  He said he does not do much walking, but walks without a cane.  R. 296.  He said

that he experiences muscle spasms in his left leg.  R. 294.  He said he got the muscle

spasms both when sitting and when in bed; he described the spasms as a painful,

burning sensation occurring every 15 minutes all day long.  R. 305-306.  He said he

could sleep only about 3 hours at night before waking up.  R. 308.  He said he could sit

for only 5 to 10 minutes without having to rise to relieve the pain.  R. 296.  He said his

treating physician, Dr. Williams, instructed him to do no lifting and no work.  R. 197.

Plaintiff said that after his physical capacities examination, he "couldn't move" for

the next three days, and said he could not work like that every day.  R. 299.  He said he

did not think he could repetitively lift 20 pounds.  R. 300.

Plaintiff said that his surgeon, Dr. Maddox, put him in "pain management" with

Dr. Flanagan.  R. 303.  Dr. Flanagan, he said, gave him an epidural, OxyContin, and a

muscle relaxant.  R. 303-304.  He said: "Then I got off OxyContin because I was getting addicted to it."  R. 304.  He also said he could not afford the medications.  R. 304. Plaintiff testified that it cost about $500 per month regularly to take pain medication.  R. 284.  He said the office visit was $120 and the medication cost over $300.  *Id.* and R. 309.  He said that he did not take over-the-counter pain medications because they did not help his pain.  R. 304-305.

The medical evidence in the record is the following.  Plaintiff began treatment with Dr. J. Paul Maddox in Dothan, Alabama, on July 16, 1997.  R. 130.  A CT scan from a year earlier showed a "broad based protrusion" at L5-S1.  *Id.*  Plaintiff was recommended for an MRI.  *Id.*

Plaintiff returned 12 days later with continued complaints of severe back, left hip, and left leg pain.  R. 129.  Significant degeneration of the lower two discs of his back with a central protrusion at L4-L5 was noted.  *Id.*  A discogram was recommended.  *Id.*

He returned on October 24, 1997, having failed to cope with the pain and reporting that he was unable to work.  R. 128.  Dr. Maddox determined that conservative measures had been exhausted, and that Plaintiff was a candidate for surgery.  *Id.*  Among the adverse possible outcomes discussed with Plaintiff was the possibility of "what appears to be a successful fusion and still have persistence in back or hip and leg pain."  *Id.*

Plaintiff had surgery in late March, 1998.  R. 125.  By April 6, 1998, Dr. Maddox stated that he was healing well and anticipated his ability to go from "sedentary light to moderate work."  R. 124.  By August 13, 1998, Plaintiff told Dr. Maddox that he was

"better from the surgery but describes some burning across the low back and into the

left leg."  R. 122.  Upon examination, Dr. Maddox:

> did not see any objective evidence of this.  His nerve root tension signs
> are negative.  His reflexes are brisk.  His muscles are strong.  There is no
> weakness.  His back wound is well healed.  There is no objective spasm.
> He seems to move about the examining room well.

R. 122.  He further noted:

> I think this patient would be a candidate for return to work.  It would need
> to be in a light to moderate job.  No repetitive extremes of lifting or
> bending or twisting . . . .

*Id.*  Dr. Maddox, however, considered Plaintiff to be disabled for "manual labor type

employment."  *Id.*

By February 17, 1999, while he reported to Dr. Maddox that he was still having

pain, no neurological deficits were observed upon examination.  R. 121.  Straight leg

raising was positive for pain, but without a radicular component.  *Id.*  The x-rays showed

an "excellent interbody and intertransverse fusion."  *Id.*  Dr. Maddox said he was "not

really sure why he is experiencing the symptoms he describes.  There is nothing

obvious on exam or film to explain it."  *Id.*

However, by April 2, 1999, Dr. Maddox examined an MRI and saw "problems

with the 3-4 disc.  There is a central protrusion there that I do not remember being

present before."  R. 120.  He thought this might account for some of the back and left

sided hip and leg pain "that he has described."  *Id.*  A few days later Dr. Maddox noted

that before removing the hardware, he wanted a discogram above and below the fusion

to see whether there was an "adjacent level of pathology."  *Id.*  The discogram was

cancelled "on numerous occasions" by Plaintiff, and on December 1, 1999, Plaintiff's

records were referred to Dr. Alexander at the Tallahassee Outpatient Clinic.  R. 119, 118.

Meanwhile, on October 18, 1999, Plaintiff had attended a pain clinic in Dothan, Alabama, as noted by Michael T. Flanagan, M.D.  R. 206.  It was also noted by Dr. Flanagan that Dr. Maddox was the attending physician who had referred Plaintiff to the pain clinic.  *Id.*  Relying on an MRI from February 24, 1999, Dr. Flanagan had a concern that "the patient may have sustained a central protrusion creating some discogenic stenosis at the L3-4 level to account for some of his back and left-sided hip pain."  *Id.* There was consideration at that time of removal of the hardware from the previous surgery, but Dr. Maddox wanted "provocative discography prior to surgical intervention." *Id.*  Plaintiff reported smoking 1.5 packs of cigarettes a day and drinking 12 cans of beer a day.  R. 207.  Plaintiff said that he was then in the process of applying for disability. *Id.*  Signs of alcohol abuse were noted by Dr. Flanagan.  R. 208.  Plaintiff was taking Lortab for pain.[2]  Upon examination of Plaintiff's lower extremities, the only positive sign of pain was in straight leg raising (without radiation) and tenderness of the lower back to palpation.  *Id.*  Dr. Flanagan's assessment was failed back syndrome, degenerative disc disease, and possible discogenic back pain.  *Id.*  Consent to schedule a discogram was obtained, with plans to schedule it in ten days.  *Id.*  Pain was to be managed as needed. R. 209.

On January 26, 2000, Dr. Charles H. Wingo examined Plaintiff.  R. 132.  Dr. Wingo noted the disc fusion surgery two years earlier.  *Id.*  Plaintiff said that beginning

---

[2] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE (2004), p. 3233.

one month after the surgery, he had experienced a burning pain, with muscle spasms, in his left leg.  *Id.*  Plaintiff brought with him the February, 1999, MRI that indicated "central disc herniation" at L3-4.  *Id.*  Dr. Wingo recommended a lumbar myleogram, CT scan, and an EMG/NCS of the left leg.  *Id.*  Dr. Wingo noted that "at the present time he is unable to work."  *Id.*

On January 28, 2000, Plaintiff called Dr. Maddox's office, demanding pain medications.  R. 118.  His request was refused, and it was noted that he had cancelled the discogram a number of times.  *Id.*

On February 1, 2000, Dr. Maddox reluctantly provided pain medications.  R. 118. Plaintiff related to Dr. Maddox that Dr. Wingo had told him he was 100% disabled.  *Id.* Dr. Maddox said he "certainly felt that he may have discogenic back pain and there may be other problems referable to his prior disk surgery and fusion."  *Id.*  He recommended a coordinated effort as to how Plaintiff got his analgesics, perhaps a pain management clinic.  *Id.*

Dr. Maddox also provided 15 Lortabs on February 14, 2000, but Plaintiff said he was scheduled for a myelogram by Dr. Wingo, and it was Dr. Maddox's impression that Plaintiff would not be returning to him for treatment.  R. 117.  Plaintiff returned to Dr. Maddox on March 1, 2000, to get more pain medication, but Dr. Maddox said he could not write prescriptions because Plaintiff was under the treatment of Dr. Wingo.  *Id.* However, it was noted that Plaintiff said that Dr. Wingo would not provide pain medications because he had not been the surgeon.  *Id.*  Dr. Maddox again suggested a pain management team evaluation.  *Id.*

On March 15, 2000, Dr. Maddox refilled Plaintiff's prescription for Lortab.  R. 116.
Plaintiff had missed the last two appointments for his pain management clinic, and he
was rescheduled for April 10, 2000.  *Id.*  The pain medication was to last until April 10,
2000, and Plaintiff was "clearly" informed that this was the last refill.  *Id.*

On April 10, 2000, Plaintiff returned to Dr. Flanagan and the pain clinic.  R. 202.
He still had failed to undergo the discogram.  *Id.*  He was currently using Lortab to
manage the pain.  *Id.*  It was noted that he had "failed nonsteroidal anti-inflammatory
drugs, Darvocet, Percocet, Ultram and Flexeril in the past," apparently meaning that
these drugs had not been effective.  R. 203.  All objective tests for pain were negative
except straight leg raising and palpation.  *Id.*  Dr. Flanagan advised Plaintiff to
discontinue the use of tobacco in part due to its role in the "alteration in pain perception
threshold."  R. 204.  Plaintiff said that he continued to smoke one pack a day.  R. 203.
A trial prescription for Methadone was started and the benefits were to be assessed at
the next appointment, in four weeks.  R. 204-205.  A home exercise program of
stretching, strengthening, range of motion, and walking was to have been initiated.  R.
204.  A variety of possible future alternative pain management procedures was set forth
at the end.  R. 205.

Plaintiff returned to the pain clinic on May 9, 2000.  R. 199.  He continued to
report severe pain, but Dr. Flanagan noted that he also "continues to do household
chores and play in the yard with his dog."  *Id.*  Plaintiff said he did not want to "proceed
with further surgical management."  *Id.*  Plaintiff said that methadone had provided
"significant relief of symptoms."  *Id.*  Plaintiff continued to smoke one pack a day, with
no intention of stopping.  R. 200.  It was noted that Plaintiff had a "history of medical

non-compliance."  *Id.*  He was again advised of the adverse effects of smoking tobacco,

and warned to stop.  R. 201.

Plaintiff did not return to Dr. Wingo until August 17, 2000.  R. 131.  He asked for

Lortab, but Dr. Wingo's nurse advised him that since he was not a surgical patient or

suffering an acute injury, it was Dr. Wingo's policy not to prescribe a narcotic.  *Id.*  She

offered to make an appointment for Plaintiff, but he declined.  *Id.*

Plaintiff returned to Dr. Flanagan and the pain clinic on September 12, 2000.  R.

195.  He reported pain of 10 on a scale of 10 with weight bearing activities.  *Id.*  It was

noted that he had last been seen on July 7, 2000, but had failed to call or attend his

appointment on August 21, 2000.  *Id.*  He reported he began to get a rash from taking

methadone, and he "has subsequently discontinued all pain medication."  *Id.*  He

continued to smoke one pack of cigarettes a day.  *Id.*  All objective tests for pain were

negative except straight leg raising and palpation of the lumbar region.  R. 196.

OxyContin was substituted for methadone.  *Id.*

On October 10, 2000, Plaintiff returned to the pain clinic.  R. 191.  He reported

pain at level 9 on a scale of 10.  *Id.*  He had reduced his consumption of cigarettes to 7

per day, but had not engaged in a home exercise program except to walk frequently.  *Id.*

With the OxyContin, he had been able to go to a rodeo and to camp with his family.  *Id.*

Again, the only positive signs of pain were in straight leg raising and palpation.  R. 192.

He rose from a sitting position to a standing position without assistive devices,

ambulated with a normal gait, had fully intact motor strength in all muscle groups of the

lower extremity, had no muscle atrophy, could toe and heel stand and deep knee bend,

had equal and intact sensations (except decreased sensation in the left lower

extremity), and was without pain on hyperextension or lateral rotation. *Id.* Dr. Flanagan

congratulated Plaintiff on his reduction of cigarettes and encouraged further reduction.

R. 193. Plaintiff reported he had stopped swimming because it was too cold, but

continued to walk. *Id.* He was to return in eight weeks. *Id.*

Plaintiff was seen again on December 5, 2000, at the pain clinic. R. 187.

Plaintiff was still using OxyContin. *Id.* The rest of the notes are much the same as in

previous months. R. 187-189.

Plaintiff was seen at the pain clinic on January 25, 2001, reporting that the pain

was well-controlled with OxyContin, though he continued to report very high pain levels.

R. 183. He was experiencing increased activity and improved quality of life. *Id.* He had

fallen down stairs, he said, and that caused the increase in pain level. *Id.* He reported

going hunting. *Id.* He was satisfied with his current medical regimen. R. 184. Again,

the physical examination revealed few objective signs of pain. *Id.*

Plaintiff returned to the pain clinic on April 26, 2001, complaining of pain at a

level of 10. R. 178. He said he had been working offshore on a boat and that increased

the pain. *Id.* He was scheduled to return to that work for a six week duration. *Id.* He

continued to report improvement of life with OxyContin. *Id.* He was able to hunt, swim,

and do yard work. *Id.* OxyContin was continued. R. 180.

Plaintiff returned to the pain clinic on October 29, 2001. R. 174. He received a

lumbar epidural steroid injection. R. 175. He had reported his pain was "horrible," 10

on a scale of 10. R. 171. It was noted that he "continues to enjoy activity such as

hunting, yard work, swimming, fishing and working off shore on an oil rig." *Id.*

OxyContin was continued. R. 172. He was to return in four weeks. R. 173.

On April 26, 2002, Plaintiff was seen by Dr. Flanagan.  R. 222.  The notes are difficult to decipher, though they appear to be the same findings as on February 1, 2002.  *Id.* and R. 223.

On June 21, 2002, Plaintiff had an extensive residual functional capacity evaluation on referral by Dr. Flanagan.  R. 133-170.  When asked by the Social Security Administration to provide a treating physician's physical capacities evaluation, Dr. Flanagan appended the results of this evaluation.  R. 133-134.  The test results were judged to be reliable based upon reliable effort by Plaintiff.  R. 135.  It was found that Plaintiff had limits due to low back and left leg pain.  *Id.*  In most functional abilities, however, it was determined that Plaintiff had the ability to perform at the "medium" physical demand level.  *Id.*  It was noted that he experienced numbness and weakness in his left lower extremity during activities involving lifting, carrying, and stooping.  *Id.*  It was determined that he could frequently sit, walk, climb stairs, kneel, and stand.  R. 136.

On October 14, 2002, Plaintiff was seen by Dr. Flanagan at the pain clinic.  R. 221.  It was found that his pain was aggravated by weight bearing and spine loading, and relieved by medical management.  *Id.*  Plaintiff reported improved pain control with medications.  *Id.*  It was found that he had weakness, decreased range of motion, numbness, and tenderness of the left paravertebral muscles.  *Id.*  Medication was provided for muscle spasms.  *Id.*

Plaintiff was evaluated by Dr. Flanagan on November 19, 2002.  R. 220.  He was found to have limited range of motion, and had difficulty with weight bearing and spine loading activities.  *Id.*  It was found that he had constant myofascial spasm, decreased

sensation on the left, positive straight leg raising on the left, and had an antalagic gait.
*Id.*

The Administrative Law Judge found Plaintiff's pain testimony to be "not

persuasive in view of the inconsistencies in the record."  R. 13.  He did not mention the

Eleventh Circuit's pain standard, but he gave a number of reasons for discounting

Plaintiff's testimony.

The ALJ noted that there "is no indication in Dr. Wingo's records that he had told

the claimant not to lift more than 5 to 10 pounds, or not to work, or to apply for

disability."  *Id.*  He noted that Dr. Wingo's last date of treatment was more than two

years before the alleged date of onset of disability.  *Id.*  He found no indication in the

medical records that Plaintiff had "become addicted to pain medications."  *Id.*

The Administrative Law Judge further found no evidence in the medical record

that Plaintiff's "hip 'went out,' that he experienced constant left side numbness, that he

had muscle spasms occurring every 15 minutes all day long, or that he was unable to

sleep more than 3 hours."  *Id.*

Additionally, Administrative Law Judge discounted Plaintiff's pain testimony

because 5 months prior to the alleged onset date, "an extensive functional capacity

evaluation revealed that [he] was capable of meeting the demands of medium work,"

could carry light weights, and there was no evidence of deterioration of Plaintiff's

condition since that evaluation.  *Id.*

Finally, the Administrative Law Judge disbelieved Plaintiff's pain testimony

because Plaintiff had not sought "any medical regiment for treatment of his subjective

symptoms."  *Id.*  He noted that Plaintiff did not take any medications, had not sought

physical therapy sessions, had not gone to the emergency room or the hospital, and had no ongoing treatment relationship with a physician.  R. 13-14.  He reasoned that despite Plaintiff's inability to pay for such health care, there was no evidence that he had sought free health care or gone to the emergency room, where he would not be turned away for lack of ability to pay.  R. 13.

All of these findings are supported by substantial evidence in the record.  From November, 2002, the last record from the pain clinic, to June, 2004, the date of the administrative hearing, there is no record of any medical treatment.  While Plaintiff's testimony that he cannot afford health care has not been rebutted, there is no evidence that Plaintiff sought treatment or medication and was turned away for lack of funds. Further, the objective findings by Dr. Flanagan upon examination provide only limited corroboration of Plaintiff's pain testimony, that is, positive straight leg raising and pain upon palpation.  All other objective signs were negative for pain.  Plaintiff apparently was rather active during the time he was attending the pain clinic, reporting that he had been hunting, swimming, did yard work, and had worked on an offshore oil rig.  The ability to do these activities may have been the result of pain medication, but this shows that Plaintiff was able to resume activities when following a pain management regimen. Finally, the last evidence from Dr. Flanagan is the physical capacities examination.  This was an examination which Dr. Flanagan, as treating physician, obtained and then stood behind when he supplied it upon request to the Administrative Law Judge.  The results of that examination are significantly at odds with Plaintiff's pain testimony. Consequently, Plaintiff's first contention is not persuasive.

**Testimony from a vocational expert**

Plaintiff argues that the Administrative Law Judge was obligated to obtain testimony from a vocational expert, given the limitations caused by his back pain.  This is a claim that the decision that Plaintiff is capable of doing a full range of light work is not supported by substantial evidence in the record.

At step 5 the Commissioner may in certain cases rely upon the "grids," to carry her burden of proving that there are jobs which the Plaintiff can do despite his inability to return to his past relevant work.  But the "grids" may be used by the Commissioner "only when each variable on the appropriate grid accurately describes the claimant's situation."  Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

There are four variables:  age, education, past work skills, and physical exertional requirements specified for the category of work (sedentary, light, medium, and heavy).  Heckler v. Campbell, 461 U.S. 458, 461-462, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983).  "Exclusive reliance on the grids is appropriate in cases involving only exertional impairments (impairments which place limits on an individual's ability to meet job strength requirements)."  Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995), *citing* Campbell.

> Exclusive reliance on the grids is not appropriate either when a claimant is unable to perform a full range of work at a given functional level or when a claimant has non-exertional impairments that significantly limit basic work skills. . . .  The grids also may not be used when the claimant's non-exertional impairments are severe enough to preclude a wide range of employment at the level indicated by the exertional impairments. . . .  Non-exertional impairments include "postural and manipulative limitations, and must be considered in determining a claimant's residual functional capacity."  20 C.F.R. § 416.945(d).

Walker v. Bowen, 826 F.2d at 1002-1003; Phillips v. Barnhart, 357 F.3d 1232, 1242

(11th Cir. 2004).[3]

        "The first condition that requires the ALJ to consult a vocational expert is when

the claimant's exertional limitations prevent the claimant from performing a full range of

employment.  This Court has interpreted a 'full range of employment' as being able to

do 'unlimited' types of work at the given exertional level."  Phillips v. Barnhart, 357 F.3d

at 1242 (citations and footnote omitted).  "Exertional limitations affect an individual's

ability to meet the seven strength demands of the job: sitting, standing, walking, lifting,

carrying, pushing, and pulling."  *Id.*, n. 11 (citations omitted).

        The second condition considers non-exertional limitations.  "Nonexertional

limitations or restrictions affect an individual's ability to meet the other demands of jobs

and include mental limitations, *pain limitations*, and all physical limitations that are not

included in the seven strength demands."  *Id.*, n. 11 (citations omitted, emphasis

added).  "When considering [a claimant's] nonexertional limitations, the ALJ need only

determine whether [the claimant's] nonexertional impairments *significantly* limit her

basic work skills."  Phillips v. Barnhart, 357 F.3d at 1243 (citations omitted, emphasis

added).  This means "limitations that prohibit a claimant from performing 'a wide range'

of work at a given work level."  *Id.*

---

        [3] *See also* Passopulos v. Sullivan, 976 F.2d 642, 648 (11th Cir. 1992) ("This court
has recognized that the grids may be used in lieu of vocational testimony on specific
jobs if none of the claimant's nonexertional impairments are so severe as to prevent a
full range of employment at the designated level.") (citations omitted).  "When the
claimant cannot perform a full range of work at a given level of exertion or the claimant
has non-exertional impairments that significantly limit basic work skills, exclusive
reliance on the grids is inappropriate."  Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir.
1999), *cert. denied*, 529 U.S. 1089 (2000).

"The preferred method of demonstrating job availability when the grids are not controlling is through expert vocational testimony."  Francis v. Heckler, 749 F.2d 1562, 1566 (11th Cir. 1985).  "It is only when the claimant can clearly do *unlimited* types of light work, . . . that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy."   Allen v. Sullivan, 880 F.2d 1200, 1202 (11th Cir. 1989) (emphasis by the court), quoting Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. Unit A 1981).  "The ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture."  Allen v. Sullivan, 880 F.2d at 1201.  Where the grids are not appropriate, and the Administrative Law Judge has not made specific findings as to the availability of particular jobs that exist in substantial numbers in the national economy which the Plaintiff can do despite his limitations, the proper course is for the court to remand for such factfinding.  Welch v. Bowen, 854 F.2d 436, 439-440 (11th Cir. 1988).

The Commissioner's rules define "light work" in part:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b) and 416.967(b).

While it is possible that some treating physician along the way might have expressed the opinion that Plaintiff's ability to do a full range of light work is limited by the pain he experiences, that is not the record here.  There is a significant record of provision of pain medications, but the objective findings of pain are very limited and the only physical capacity evaluation that was done, at the direction of Dr. Flanagan, indicates an ability to a range of medium work.  The second contention, therefore, is also not persuasive.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on January 3, 2006.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**